IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
November 06, 2024
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

| | |
|---|---|
| E.M., K.M., H.M., and C.M., by their guardian and next friend, Madeline Grochowski, | ) ) ) ) |
| Plaintiffs, | ) Case No. 7:24-cv-288 |
| v. | ) ) By: Michael F. Urbanski ) Senior United States District Judge |
| ROBIN BROWN and CRYSTAL BRAKE, | ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION

This matter comes before the court on defendants' motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). ECF No. 7. Plaintiffs filed a response in opposition to the motion, ECF No. 13, and defendants replied, ECF No. 14. The court held a hearing on the motion on September 11, 2024. For the reasons discussed below, the court will **GRANT** the motion to dismiss.

Plaintiffs are four minor siblings who were removed from their parents' custody and placed into the care of Madeline Grochowski by the Henry-Martinsville Department of Social Services ("DSS") in late 2020 and early 2021. Plaintiffs bring this 42 U.S.C. § 1983 action against two employees of the Roanoke County DSS—defendants Robin Brown (formerly Robin Freeman) and Crystal Brake. Plaintiffs allege that Brake initiated and Brown conducted an investigation into Grochowski for potential abuse or neglect that caused the foster children to be temporarily removed from Grochowski's home for a period of months in 2022-2023. Plaintiffs allege that they were deprived of their Fourteenth Amendment liberty interests in

"safety by maintaining their stable and secure residential and familial home and relationship with their preferred foster and prospective adoptive parent Mrs. Grochowski" and in "association with their siblings in that home." Compl., ECF No. 1, ¶ 78. Plaintiffs also allege that they were deprived of their Fourteenth Amendment property interest in Virginia Enhanced Maintenance (VEMAT) payments, which Grochowski had received on their behalf prior to the investigation.

Plaintiffs allege that Brake's decision to launch an investigation violated plaintiffs' due process rights because Brake failed to adequately consider important factors and properly complete a mandatory checklist in making her high stakes determination as to whether a report of child abuse or neglect was valid. Although failing to complete a checklist may violate the terms of the Virginia Child and Family Services Manual, failing to complete a checklist does not "shock the conscience." Thus, the procedural failings alleged here are not of constitutional magnitude. Plaintiffs' claim also fails as to Brown because Brown's only involvement with this case was in conducting the investigation, and the investigation was required once Brake determined the report was valid. The harms plaintiffs allege flow from their separation from one another and from Grochowski, and that separation was triggered by the initiation of the investigation, not by Brown's conduct of the investigation. Finally, because plaintiffs have not plausibly alleged that they stopped receiving VEMAT payments at any point while they were still entitled to them, plaintiffs have not stated a claim that either defendant deprived them of their property.

Therefore, the court will dismiss plaintiffs' claims against both defendants.

## I.  Background

E.M., K.M., H.M., and C.M. entered the foster care system after suffering abuse and neglect. Compl., ECF No. 1, ¶ 5. Henry-Martinsville DSS placed E.M. and C.M. with Madeline Grochowski in August 2020, and K.M. and H.M. joined them six months later. Id. ¶ 4. Because all four children were diagnosed with certain conditions, Grochowski received enhanced maintenance payments—known as VEMAT payments—on their behalf to provide for additional required treatments and services.[1] Id. ¶ 6. Plaintiffs' individually calculated VEMAT payments totaled $9,936.00 per month.[2] Id.

On May 5, 2022, the eldest sibling, C.M., who was then 12 years old, was leaving the house in Salem, Virginia to catch the school bus, when she called to her little brother, E.M., who was then seven years old, to come outside and give her a hug before she left. Id. ¶¶ 7-11. Before E.M. made it outside, however, C.M. left for the bus stop, and E.M. decided to run after her. Id. ¶ 11. E.M. was not able to catch up to C.M. before she got on the bus, so he cut across their cul-de-sac and an adjacent yard and stopped on the sidewalk to try to catch the bus further along on its route. Id. ¶ 12. A Roanoke County sheriff's deputy spotted E.M. by himself and tried to speak to him, but E.M. ran home out of fear of talking to a stranger. Id.

---

[1] VEMAT payments are defined by regulation as "payment[s] made to a foster parent over and above the basic foster care maintenance payment . . . based on the needs of the child for additional daily supervision as identified by the uniform rate assessment tool." 22 Va. Admin. Code § 40-221-10.

[2] The Virginia Enhanced Maintenance Assessment Tool (hence "VEMAT") is used to assess "the child's behavioral, emotional, and physical/personal care needs to determine if an enhanced maintenance payment is necessary to ensure the safety and well-being of the child." Virginia Child and Family Services Manual, Title E: Foster Care, § 18.2.1 at 11. After an evaluation process that involves the child, foster parents, DSS, others who know the child, and a trained "VEMAT rater," ratings are assigned reflecting the child's degree of need, and the ratings are used to calculate the required VEMAT payment. Id. §§ 18.2.2.2-18.2.2.5.

¶ 13. Plaintiffs allege that E.M. was only gone for a few minutes in total, and he only traveled approximately 300 feet from the house. Id. ¶¶ 12-14.

The sheriff's deputy followed E.M. home, interviewed Grochowski, and, as required by law, reported the incident to the Commonwealth's Attorney—which found no basis for any charges—and to DSS. Id. ¶ 15. The next day, defendant Crystal Brake, a supervisor and social worker with Roanoke County DSS, received the report and classified it as a "Low Response" priority.[3] Id. ¶ 16.

Virginia law requires DSS to determine the validity of all reports of child abuse and neglect. Va. Code Ann. § 63.2-105. Under Virginia regulations, "[a]ll complaints and reports of suspected child abuse or neglect *shall* be . . . either screened out or determined to be valid upon receipt by the local department of jurisdiction." 22 Va. Admin. Code § 40-705-50(A) (emphasis added). The four elements considered in determining complaint or report validity are:

> 1. [whether] [t]he alleged victim or children are under the age of 18 years at the time of the complaint or report; 2. [whether] [t]he alleged abuser is the alleged victim child's parent or other caretaker . . . ; 3. [whether] [t]he local department receiving the complaint or report has jurisdiction; and 4. [whether] [t]he circumstances described allege suspected child abuse or neglect as defined in § 63.2-100 of the Code of Virginia.

---

[3] Although the children were placed by and remained the responsibility of the Henry-Martinsville DSS, the report and investigation here took place in Roanoke County because Grochowski lives in Roanoke County. Compl., ECF No. 1, ¶¶ 4, 7, 26. Roanoke County DSS "retained ongoing jurisdiction" over the report against Grochowski at issue in this case. Id. ¶ 72.

4

Virginia Child and Family Services Manual, Title C: Child Protective Services, § 3.5 at 15.[4]
While the first three elements are relatively objective criteria, the fourth requires DSS to engage
in a more detailed subjective evaluation. Here, that task fell to Brake.

In determining whether a report's allegations constitute abuse or neglect, the Virginia
Child and Family Services Manual requires that DSS "*must*" consider four factors:

> [1] what was the action or inaction of the caretaker; [2] did the
> child sustain an injury or is there evidence establishing that the
> child was threatened with sustaining an injury; [3] does the
> evidence establish a nexus, or causal relationship between the
> action or inaction of the caretaker and the physical injury or
> threatened physical injury to the child; and [4] was the injury, or
> threat of injury, caused by non-accidental means?

Title C: Child Protective Services, § 3.5.2.3.1 at 21. Plaintiffs here allege that Brake "either
ignored or did not document any consideration or answer to these questions." Compl., ECF
No. 1, ¶ 24.  Plaintiffs further allege that if she had, the answer to each of these questions
would have revealed no abuse or neglect. Id.

The Manual further requires that "[w]hen determining validity, the [DSS] *must* use the
CPS Intake Tool." Virginia Child and Family Services Manual, Title C: Child Protective
Services, § 3.5 at 15 (emphasis added). The intake tool directs DSS to select from a list of
possible forms of physical or mental abuse or neglect, including "[i]nadequate supervision" as
well as "[o]ther physical neglect." Virginia Department of Social Services, SDM Intake Tool

---

[4] In evaluating a motion to dismiss, this court is limited to the allegations of the complaint, documents incorporated by reference therein, and to facts the court may judicially notice under Federal Rule of Evidence 201. In re Under Armour Sec. Litig., 540 F. Supp. 3d 513, 519 (D. Md. 2021). Plaintiffs have incorporated the Virginia Child and Family Services Manual into their complaint, see Compl., ECF No. 1, ¶¶ 18-19, 22, 24-26, and, even had they not, this court may take judicial notice of state administrative guidance, particularly where such guidance is publicly available on government websites. See Hilton v. Gossard, 702 F. Supp. 3d 425, 430 (D.S.C. 2023) ("Courts may take judicial notice of governmental websites.").

at 1. Inadequate supervision is defined to include "minimal care or supervision by the caretaker resulting in placing the child in jeopardy of . . . physical injury." Virginia Child and Family Services Manual, Title C: Child Protective Services, § 2.4.2.2 at 15. Plaintiffs allege that Brake never filled out the intake tool when determining whether E.M.'s escapade chasing the school bus indicated abuse or neglect. Compl., ECF No. 1, ¶¶ 24, 27. If she had, plaintiffs allege it would have been clear that the report concerning E.M. did not meet the definition for any form of abuse or neglect, including the definition for inadequate supervision, and thus was not the proper subject of an investigation. Id. ¶¶ 29, 31. Moreover, plaintiffs allege that no physical injuries befell E.M., that E.M. remained at all times nearby the Grochowski home, and that any lapse in supervision allowing E.M. to impulsively slip out the door was "purely accidental." Id. ¶¶ 31-33.

Nevertheless, Brake concluded that the report was valid. Id. ¶ 36. This decision initiated an investigation and required all four siblings to be removed from Grochowski's home on May 6, 2022. Id. ¶ 36. Plaintiffs allege that "Defendants knew" that removal would be the consequence of an investigation. Id. Being removed from their home with Grochowski caused plaintiffs significant confusion, fear, and emotional distress. Id. ¶ 37. While DSS was initially planning to place the children in different homes during the investigation, at Grochowski's urging, DSS allowed the children to stay together at the home of Grochowski's friend, Sara Warren, so that they would not be separated pending the outcome of the investigation. Id. ¶ 38. DSS also allowed the children to return to the Grochowski home every day after school during this time so that Grochowski could supervise them until it was time to go to sleep at

the Warren home. Id. ¶ 51. This initial investigation period lasted approximately two weeks. Id. ¶ 39.

Defendant Robin Brown, another Roanoke County DSS employee, handled the investigation under Brake's supervision. Id. Initially, on May 6, 2022, Brown conducted a required "safety assessment" of E.M. "and found no evidence of any safety risk in the home." Id. ¶ 36. However, plaintiffs allege that, during the subsequent two-week investigation, Brown disregarded numerous required steps and considerations under Virginia law and the Virginia Child and Family Services Manual. Id. ¶ 39. Plaintiffs further allege that the case file Brown developed did not contain a single piece of evidence suggesting E.M. was at risk of harm; instead, plaintiffs allege that Brown ignored key positive evidence, including calls and emails from E.M.'s counselor, who told Brown that removal from the Grochowski home would traumatize the children. Id. ¶¶ 45-47.

On May 20, 2022, Brown determined that Grochowski was guilty of "Founded-Physical Neglect (Inadequate Supervision)—Level Two" as to E.M. based on the May 5, 2022 incident in which E.M. ran out of the house and toward the road unsupervised. Id. ¶ 60. This finding resulted in all four plaintiffs being removed to other foster homes. Id. ¶ 61. Although the complaint is less than clear, plaintiffs contend that during this period, E.M., K.M., H.M., and C.M. no longer lived in the Warren home and were separated from one another and from Grochowski.[5]

_____

[5] In evaluating a motion to dismiss, the court is obligated to construe the allegations of the complaint in the light most favorable to plaintiffs. Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017). Thus, the court will assume that the children were separated and lost contact with Grochowski during this period, although the allegations of the complaint are vague on the issue. See Compl., ECF No. 1, ¶ 61 (alleging that the children were separated from Grochowski "and, apparently, each other").

Grochowski appealed the decision within DSS and petitioned for emergency custody in Henry County Juvenile and Domestic Relations Court. Id. ¶ 67. On July 6, 2022, Henry County Juvenile and Domestic Relations Court held a hearing on the emergency custody petition and ordered that the children be placed in Grochowski's provisional custody. Id. ¶ 68. Thus, assuming that the siblings were indeed separated upon Brown's May 20, 2022 "Founded-Physical Neglect" determination, the period of separation from one another and from Grochowski was at most the 47 days between May 20 and July 6, 2022. It is this separation that plaintiffs allege deprived them of their Fourteenth Amendment liberty interests in security and familial association. Id. ¶ 78.

On January 4, 2023, the Henry County Juvenile and Domestic Relations Court awarded full custody of E.M., K.M., H.M., and C.M. to Grochowski. Id. ¶ 70. Grochowski's pursuit of custody was supported by plaintiffs' biological parents, plaintiffs' guardian ad litem, and representatives of Henry-Martinsville DSS, who were all present at the hearing. Id. Nevertheless, Roanoke County DSS did not withdraw its finding of neglect. Id. ¶ 71.

On June 9, 2023, the Department of Social Services Appeals and Fair Hearing Unit held a hearing on Grochowski's DSS appeal. Id. ¶ 73. The Administrative Hearing Officer considered the file prepared by Brown and Brake, determined that the record did not provide an evidentiary basis for the charge of neglect, and accordingly amended the complaint to "unfounded." Id. ¶ 74. Defendants did not appeal the Administrative Hearing Officer's decision, which is final. Id. ¶ 75.

As to the status of their VEMAT payments throughout these events, plaintiffs allege that their VEMAT payments were "permanent[ly]" cut off upon Brown's May 20, 2022

determination that Grochowski was guilty of Founded-Physical Neglect.[6] Id. ¶ 61. Plaintiffs allege that even once the children were returned to Grochowski's care when a Henry County Juvenile and Domestic Relations court judge granted Grochowski's July 6, 2022 emergency custody petition, Grochowski was still unable to receive VEMAT payments because Roanoke County DSS "refused to take any action to revisit or amend the founded neglect complaint." Id. ¶ 69.

Defendants argue that, in fact, because VEMAT payments follow the child, not the foster parent, the children were still receiving VEMAT payments via their other foster placements during the period of removal from the Grochowski home between May 6, 2022 and July 6, 2022, even if Grochowski was not herself receiving the payments because the children were no longer in her care. Mem. Supp. Mot. Dismiss, ECF No. 8 at 9 ("Had the M children remained foster children, with any foster parent in Virginia, the same payments would have continued for them, payable to the foster home to which they were assigned."). Regardless, defendants explain that after Grochowski successfully petitioned to become plaintiffs' "legal custodial guardian" on July 6, 2022, the children lost their entitlement to VEMAT payments because the children had ceased to be foster children and therefore were no longer eligible, Reply, ECF No. 14 at 3,—not, as plaintiffs allege, because DSS refused to revisit the founded neglect finding as to Grochowski, Compl., ECF No. 1, ¶ 69.

---

[6] It is unclear whether VEMAT payments flowed to the children through Grochowski or through Warren during the brief two-week investigation period prior to Brown's finding of neglect. See Compl., ECF No. 1, ¶ 30. However, because plaintiffs allege their VEMAT payments were received on a monthly basis, id. ¶ 6, there may well have been no disruption during this initial two-week period.

Plaintiffs filed a complaint seeking monetary damages on April 29, 2024. ECF No. 1. On July 5, 2024, defendants filed a motion to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). ECF No. 7. As to plaintiffs' liberty interests, defendants argue that there is no Fourteenth Amendment right to a particular foster placement. Mem. Supp. Mot. Dismiss, ECF No. 8 at 11. As to plaintiffs' property interests, defendants argue that plaintiffs do not have a property interest in VEMAT payments because the payments are paid to foster parents. Id. at 8. Defendants further argue that even if VEMAT payments are a foster child's property, plaintiffs were never actually deprived of their VEMAT payments, which followed plaintiffs as they moved between foster households, id. at 9, until they were properly terminated when Grochowski gained custody, id. at 10. According to defendants, Grochowski's intervening act of filing a custody petition was not the result of any conceivable wrongdoing by defendants. Id. Defendants also argue that they are entitled to qualified immunity. Id. at 13.

## II. Legal Standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); see also Simmons v. United Mortg. & Loan Inv., LLC, 634 F.3d 754, 768 (4th Cir. 2011) ("On a Rule 12(b)(6) motion, a 'complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face.'") (quoting Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (emphasis omitted)).

A court must consider all well-pleaded allegations in a complaint as true and construe them in the light most favorable to the plaintiff. Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017). Nevertheless, a court is not required to accept as true "a legal conclusion couched as a factual allegation," Papasan v. Allain, 478 U.S. 265, 286 (1986); conclusory allegations devoid of any reference to actual events, United Black Firefighters of Norfolk v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979); or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001)).

## III.   Discussion

Plaintiffs have failed to state a plausible claim for relief under 42 U.S.C. § 1983 ("Section 1983"). Section 1983 provides tort-like liability against government officials acting "under color of" state law for plaintiffs who have been subjected to a deprivation of their federal rights. 42 U.S.C. § 1983. Plaintiffs here allege that Brake and Brown violated their due process rights under the Fourteenth Amendment to the United States Constitution. Resp., ECF No. 13 at 6. The Fourteenth Amendment prohibits state actors from "depriv[ing] any

person of life, liberty, or property, without due process of law[.]" U.S. Const., amend. XIV, §
1. At issue is whether Brake and Brown unconstitutionally deprived plaintiffs of their liberty
interests in safety and familial relationships or of their property interests in VEMAT payments.
Because plaintiffs have not plausibly alleged that their separation from their siblings and
Grochowski was caused by conscience-shocking conduct or that they were actually deprived
of their VEMAT payments, plaintiffs' Section 1983 claim must be dismissed.

### A.  Liberty Interests

Plaintiffs allege that defendants violated their liberty interests in, first, "safety by
maintaining their stable and secure residential and familial home and relationship with their
preferred foster and prospective adoptive parent Mrs. Grochowski" and, second, "association
with their siblings in that home." Compl., ECF No. 1, ¶ 78.

"The Supreme Court first recognized that the Fourteenth Amendment's Due Process
Clause protects the family unit a century ago." Jonathan R. v. Justice, No. 3:19-cv-710, 2023
WL 184960, at *9 (S.D.W. Va. Jan. 13, 2023) (citing Meyer v. Nebraska, 262 U.S. 390, 399
(1923)). "[T]he Court has applied substantive due process to stave off government interference
in two aspects of family life: the parent-child relationship, and particularly intimate family
decisions, such as marriage and childbearing." Id. (citing Santosky v. Kramer, 455 U.S. 745
(1982); Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632 (1974); Loving v. Virginia, 388 U.S. 1
(1967)); see also Moore v. City of East Cleveland, 431 U.S. 494, 500 (1977) (protecting right
for a grandmother and grandson to live in a household with one another without state
interference).

Applying these constitutional protections to families in the foster care setting, where the state has already become intimately involved, is complicated. The Seventh Circuit has explained that "because they can be ended by the state, foster families must . . . be seen as enjoying a considerably more limited 'liberty' than natural families or those related by adoption." Procopio v. Johnson, 994 F.2d 325, 330 (7th Cir. 1993) (quoting Kyees v. Cnty. Dep't of Public Welfare, 600 F.2d 693, 698 (7th Cir. 1979)) (concluding that there is no constitutionally protected liberty interest in keeping a foster family together under Illinois law); see also Dupuy v. Samuels, 397 F.3d 493, 513 (7th Cir. 2005) ("[P]laintiffs rightfully concede that foster parents do not have a constitutionally protected interest in maintaining a relationship with a specific foster child."). Courts in this circuit have similarly reasoned that states have "compelling *parens patriae* interest[s] in preventing . . . abuse and neglect" which "justif[y] interference with familial relationships" for children in foster care. Jonathan R., 2023 WL 184960, at *12.

However, entering foster care does not strip a child of her constitutional rights.

### 1) Liberty Interest in Personal Safety and Security

The Fourth Circuit held in Doe ex rel. Johnson v. South Carolina Department of Social Services that foster children have fundamental liberty interests in safety and security. 597 F.3d 163, 175 (4th Cir. 2010). There, the Fourth Circuit concluded that the state officials responsible for removing Doe from her parents' custody and placing her into foster care had a "duty to refrain from placing her in a known, dangerous environment in deliberate indifference to her right to personal safety and security." Id. at 176. The state officials breached this duty by

knowingly placing Doe in foster care alongside her sexually abusive brother, though the court found that the state officials were entitled to qualified immunity. Id. at 177.

The Fourth Circuit is far from alone in recognizing that the state has a duty to prevent foster children from being placed in unsafe environments. Other courts have recognized that foster children have due process rights "to be free from the infliction of unnecessary harm," Brian A. ex rel. Brooks v. Sundquist, 149 F. Supp. 2d 941, 953 (M.D. Tenn. 2000), and "to reasonably safe placements in which they will not be harmed," LaShawn A. v. Dixon, 762 F. Supp. 959, 992 (D.D.C. 1991), aff'd and remanded sub nom., LaShawn A. by Moore v. Kelly, 990 F.2d 1319 (D.C. Cir. 1993). See also, Doe v. New York City Dep't of Social Servs., 649 F.2d 134, 141-42 (2d Cir. 1981) (applying deliberate indifference standard to state officials' supervision of safety of children in foster home); Yvonne L., By and Through Lewis v. New Mexico Dep't of Human Servs., 959 F.2d 883, 890 (10th Cir. 1992) (finding a constitutional violation would exist if state officials knew of danger to foster children and failed to exercise professional judgment).

However, the right to safety and security simply is not implicated by the facts alleged in this case. Plaintiffs here have not stated a claim under the Fourth Circuit's standard because they have not alleged that they were placed at any point in a "known, dangerous environment." Doe ex rel. Johnson, 597 F.3d at 176. In fact, plaintiffs suggest their "respite home" placement with Warren was emotionally healthy in that it preserved normalcy, and plaintiffs otherwise do not allege anything at all about the conditions they experienced in other foster placements. Compl., ECF No. 1, ¶ 38. Plaintiffs argue that the mere fact of removal from the Grochowski home jeopardized their emotional safety, id. ¶ 78, but the right to "personal safety and

security" does not extend that far. Doe ex rel. Johnson, 597 F.3d at 176. The above-cited cases largely concerned known or improperly screened risks of sexual abuse or physical violence in the homes into which foster children were placed; none concerned the alleged emotional turbulence associated with moving foster children between placements. See, e.g., Doe ex rel. Johnson, 597 F.3d at 166-67 (concerning known risk of sexual abuse); Doe v. New York City Dep't of Soc. Servs., 649 F.2d at 137 (concerning allegations of rape and severe beating inflicted on plaintiff by her foster father in the foster home in which she was placed by defendant officials); Yvonne L., By and Through Lewis, 959 F.2d at 885 (concerning failure of state officials to prevent other minor residents of foster home from sexually abusing plaintiff). Thus, plaintiffs cannot base their Section 1983 claim on a deprivation of their liberty interest in personal safety and security.

### 2) Liberty Interest in Association with Siblings

In addition to their rights to safety and security, foster children retain rights to association with their siblings. Some courts have expressed skepticism about such claims. Jonathan R., 2023 WL 184960, at *12 (concluding that even if the sibling-sibling relationship is constitutionally protected in general, "the [C]onstitution does not, in the foster care context, protect the sibling-sibling relationship"); see also Charlie H. v. Whitman, 83 F. Supp. 2d 476, 513 (D. N.J. 2000) (rejecting foster children's claims that they were deprived of familial relationships where siblings were placed separately and state officials failed to provide visitation); Jeremiah M. v. Crum, 695 F. Supp. 3d 1060, 1095 (D. Alaska 2023) (dismissing claim based on foster children's lost association with siblings).

However, the weight of authority from across the circuits supports protecting siblings' rights—at least to visitation with one another while placed in different households and to reunification when safe and appropriate. See Aristotle P. v. Johnson, 721 F. Supp. 1002, 1010 (N.D. Ill. 1989) (concluding that plaintiffs stated a claim based on defendants' depriving siblings of opportunities for visitation with one another); Eric L. By and Through Schierberl v. Bird, 848 F. Supp. 303, 307 (D. N.H. 1994) (finding that plaintiff had stated a claim based on foster child's right to be reunited when possible with family members, including siblings); Kenny A. ex rel. Winn v. Perdue, 218 F.R.D. 277, 296-97 (N.D. Ga. Aug. 18, 2003) (holding that "[t]he constitutional right to family integrity encompasses the right of children in foster care to have meaningful contact with their siblings"); Connor B. ex rel. Vigurs v. Patrick, 771 F. Supp. 2d 142, 164 (D. Mass. 2011) (finding that foster children had stated a claim based on associational freedoms when they were denied meaningful contact with family members, including siblings; see also Marisol A. by Forbes v. Giuliani, 929 F. Supp. 662, 676-77 (S.D.N.Y. 1996) (finding no right to family integrity implicated by foster system's general failure to preserve family unit, but recognizing that lack of visitation with parents and siblings may provide grounds for a claim).

Even assuming plaintiffs had liberty interests in their relationships with one another implicated by their relatively brief separation in this case,[7] defendants did not deprive plaintiffs

---

[7] Notably, because plaintiffs have not alleged anything at all about the conditions plaintiffs experienced when in other foster homes, the allegations here do not clearly indicate whether or not plaintiffs were denied visitation with their siblings, the primary focus of cases concerning foster children's rights to association with their siblings. See, e.g., Kenny A. ex rel. Winn, 218 F.R.D. at 296-97. One could construe plaintiffs' allegations as pointing toward delayed reunification, another key concern in the case law, Eric L. By and Through Schierberl, 848 F. Supp. at 307, but as explained, plaintiffs were reunified after 47 days—within the expected timeline. Compl., ECF No. 1, ¶ 41 (explaining that DSS had "at least 45 days" to complete its investigation and that that timeline could be extended). Regardless, assuming plaintiffs suffered these harms or some other form of

of such liberty interests in an unconstitutional manner. First, Brown's actions are not causally linked to the siblings' alleged separation. The Roanoke County sheriff's deputy reported observing E.M. unattended near the road on May 5, and by May 6, Brake had classified the report as valid, and the children were removed from the Grochowski home—all without any action from Brown. Compl., ECF No. 1, ¶¶ 13-17, 37. Once Brake classified the report as valid, an investigation was mandatory under Virginia law, Va. Code. Ann. § 63.2-1508(A), and as plaintiffs acknowledge, the investigation required the children to be removed from the Grochowski home, Compl., ECF No. 1, ¶¶ 30, 36. Separation became possible the moment plaintiffs were removed from the Grochowski home. Id. ¶ 38. The way in which Brown conducted her mandatory investigation did not increase the likelihood or duration of separation because the children would have remained unable to return to the Grochowski home until the investigation was resolved regardless of Brown's actions. As plaintiffs allege, "Defendants had at least 45 days to complete the Investigation," and that time "could be extended." Id. ¶ 41. And in fact, despite Brown's intervening finding of "Founded-Physical Neglect," id. ¶ 60, the children were only actually separated from one another and from Grochowski for 47 days due to Grochowski's successful emergency custody petition. Id. ¶ 68. Thus, because Brake caused plaintiffs' risk of separation and Brown did not lengthen the period of separation beyond its foreseeable duration, any associational loss plaintiffs suffered is not attributable to Brown.

---

constitutionally cognizable loss of association with their siblings, such a deprivation was not caused by unconstitutional conduct by defendants.

Brake's actions, though they caused plaintiffs' separation, were not unconstitutional. Plaintiffs plausibly allege that Brake fell short of compliance with the Virginia Child and Family Services Manual. At the very least, the Manual requires DSS to use the CPS Intake Tool, and, if Brake failed to complete the Intake Tool as plaintiffs allege, then she violated an objective directive. Virginia Child and Family Services Manual, Title C: Child Protective Services, § 3.5 at 15 ("When determining validity, the [DSS] *must* use the CPS Intake Tool.") (emphasis added). Plaintiffs' other allegations, for instance, that Brake failed to consider all required factors for identifying abuse or neglect, Compl., ECF No. 1, ¶ 24, sound more in the register of a disagreement with Brake's subjective assessment. Regardless, a Section 1983 action cannot be based solely on a violation of state law. Snider Int'l Corp. v. Town of Forest Heights, 738 F.3d 140, 145 (4th Cir. 2014) (citing Clark v. Link, 855 F.2d 156, 161, 163 (4th Cir. 1988)). For plaintiffs to state a claim, Brake's actions would need to be "arbitrary in the constitutional sense." Wolf v. Fauquier Cnty. Bd. of Supervisors, 555 F.3d 311, 323 (4th Cir. 2009) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).

Allegations of "'egregious official conduct'" will only give rise to a due process claim where the "abuse of power" is one that "'shocks the conscience.'" Wolf, 555 F.3d at 323 (quoting Lewis, 523 U.S. at 846). The Fourth Circuit has previously applied this standard to allegations accusing DSS officials of violating children's due process rights to familial relationships. In Wolf, in which a biological mother challenged DSS's investigation into a counseling center's report that she posed a threat of child abuse, the Fourth Circuit reasoned:

> DSS responded to a complaint suggesting the possibility of serious harm and proceeded to investigate and take steps to assure the safety of children that might have been in danger. Despite plaintiffs' attempts to paint DSS's actions as abusive, the

> investigation does not seem irregular, let alone conscience-shocking.

Id.; see also Weller v. Dep't of Soc. Servs. for City of Baltimore, 901 F.2d 387, 391 (4th Cir. 1990) ("It does not shock the conscience to hear that defendants removed a child in emergency action from the custody of a parent suspected of abusing him, based upon some evidence of child abuse."). The Wolf court was particularly concerned that DSS officials should not be forced to decide between, on the one hand, initiating an investigation and facing Section 1983 liability and, on the other, failing to investigate alleged abuse or neglect, risking tragic consequences. Wolf, 555 F.3d at 323.

Wolf's holding was reaffirmed in Susan Virginia Parker v. Henry & William Evans Home for Child., Inc., 762 Fed. App'x 147, 156 (4th Cir. 2019). There, in another case implicating the deeply entrenched liberty interests in the biological parent-child relationship,[8] the court concluded, "We have repeatedly held that where officials remove a child from the parents' custody for the child's protection, only an 'abuse of power which 'shocks the conscience' creates a substantive due process violation.'" Susan Virginia Parker, 762 Fed. App'x at 156. The court further explained that "conscience-shocking" allegations must reveal more than "mere negligence" or even "recklessness." Id. at 157. Thus, where DSS "had some evidence of child abuse," the subsequent separation of children from their family members

---

[8] That Wolf and Susan Virginia Parker concerned biological parents does not suggest a different standard should apply here. The high "shocks the conscience" standard of Wolf and Susan Virginia Parker is applicable to arbitrary official conduct generally, Lewis, 523 U.S. at 846 (applying standard to police conduct and characterizing the "shocks the conscience" standard as applicable to "abusive executive action"), and sibling relationships in foster care certainly do not receive greater protection than the biological parent-child relationship. See Troxel v. Granville, 530 U.S. 57, 65 (2000) (calling the biological/adoptive parent's right to the care, custody, and control of their child "perhaps the oldest of the fundamental liberty interests recognized").

was not "conscience-shocking," and accordingly, plaintiffs had not stated a substantive due process claim. Id.

Brake's alleged failure to fill out a form, even a mandatory form, does not shock the conscience. Nor does failing to record consideration of all required factors for evaluating abuse or neglect. And as in Susan Virginia Parker, the report from the Roanoke County sheriff's deputy that E.M. had been left unattended near a road provided "some evidence" of inadequate supervision supporting a finding of physical neglect and thereby justifying further investigation. Susan Virginia Parker, 762 Fed. App'x at 157. Plaintiffs attempt to frame Brake's actions as at most reckless in that she knew that initiating an investigation could cause plaintiffs to be separated. Compl., ECF No. 1, ¶¶ 78-79. However, the Fourth Circuit has been clear that negligence or recklessness is not enough; only conduct that shocks the conscience will suffice. Susan Virginia Parker, 762 Fed. App'x at 157. And it does not shock the conscience for a DSS official to err on the side of investigating possible child abuse or neglect where, as the court explained in Wolf, the risk of separating family members must be weighed against the serious consequences of failing to prevent neglect. 555 F.3d at 323.

### 3) Liberty Interest in Relationship with Foster Parent

Finally, plaintiffs cannot rely on their relationship with Grochowski to state a claim. Although the sibling-sibling relationship and the biological/adoptive parent-child relationship have been constitutionally protected, courts have not extended similar protections to the foster parent-foster child relationship. See Smith v. Org. of the Foster Fams. for Equality & Reform,431 U.S. 816, 846 n.54 (1977); Drummond v. Fulton Cnty. Dep't of Fam. & Child.'s Servs., 563 F.2d 1200, 1207 (5th Cir. 1977) (en banc); Kyees v. Cnty. Dep't of Pub. Welfare,

600 F.2d 693, 695 (7th Cir. 1979) (per curiam). The Second Circuit's decision in Rivera v. Marcus, on which plaintiffs rely, is not to the contrary. 696 F.2d 1016 (2d Cir. 1982). There, the Second Circuit found that "custodial relatives . . . are entitled to due process protections when the state decides to remove a dependent relative from the family environment." Id. at 1024. The particular foster placement in Rivera was protected where the foster parent was "related biologically" to the foster children, id.,[9] and here, Grochowski is not biologically related to plaintiffs. Even if plaintiffs' relationships with Grochowski were protected by a Fourteenth Amendment liberty interest, Brake's actions were no more conscience-shocking as regards separating plaintiffs from Grochowski than as regards separating plaintiffs themselves.

Accordingly, plaintiffs have failed to state a claim for any deprivation of a cognizable liberty interest.

### B.  Property Interest

Plaintiffs further allege that defendants have deprived them of their property interest in their VEMAT payments. Compl., ECF No. 1, ¶ 80.

A protected property interest arises in a government benefit when an individual has a "legitimate claim of entitlement to it." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972); see also Tri Cnty. Paving, Inc. v. Ashe County, 281 F.3d 430, 436 (4th Cir. 2002) (quoting Roth, 408 U.S. at 577) ("A mere 'abstract need or desire for [the benefit]' or 'a unilateral expectation

---

[9] The other factors the court considered in Rivera—that the foster children had lived with their half-sibling for several years before the foster care arrangement began and that the biological father of the foster children had not shown an interest in the children for over twelve years—are also not present in this case. Rivera, 696 F.2d at 1024-25.

of it' is insufficient."). The claim of entitlement is created and defined by "existing rules or understandings that stem from an independent source such as state law." <u>Roth</u>, 408 U.S. at 577.

Here, the VEMAT payments at issue are a benefit created by Virginia statute. For all foster children, Virginia law provides for "foster care maintenance payments" which "cover the cost of food, clothing, shelter" and other essentials. 22 Va. Admin. Code § 40-221-10. Virginia law then provides additional "enhanced maintenance payment[s]," known as VEMAT payments, "based on the needs of the child for additional daily supervision as identified by the uniform rate assessment tool." <u>Id.</u> A foster child in Virginia becomes entitled to VEMAT payments upon participating in an assessment of their needs and receiving a VEMAT rating. Virginia Child and Family Services Manual, Title E: Foster Care, §§ 18.2.2.1-18.2.2.5. Here, plaintiffs had VEMAT ratings and were receiving monthly VEMAT payments prior to the events of this case. Compl., ECF No. 1, ¶ 6.

Defendants argue that, while Virginia statute has created the benefit of VEMAT payments, the benefit is intended for the foster parent, not the foster child—to reimburse the foster parent for the costs associated with caring for the child. Mem. Supp. Mot. Dismiss, ECF No. 8 at 8. However, persuasive authority supports plaintiffs' position that while the payments are necessarily paid to the foster parent, the entitlement still belongs to the child. For example, the Seventh Circuit has held both that foster care benefits are property interests protected by the Fourteenth Amendment, <u>Youakim v. McDonald</u>, 71 F.3d 1274, 1288 (7th Cir. 1995), and that foster care benefits belong to the child, not the foster parent, <u>Dupuy v. Samuels</u>, 397 F.3d 493, 515 (7th Cir. 2005). <u>See</u> <u>also</u> <u>Sockwell v. Maloney</u>, 431 F. Supp. 1006, 1012 (D. Conn.

1976), aff'd, 554 F.2d 1236 (2d Cir. 1977) (per curiam) ("[O]nce a child is found in need of foster care and is placed in a foster home, the child acquires a property interest in foster care payments protected by the due process clause of the Fourteenth Amendment."). Thus, plaintiffs have sufficiently alleged a property interest in their VEMAT payments.

However, plaintiffs have not plausibly alleged that they were ever deprived of this interest. There are two distinct time periods at issue. First, plaintiffs have not alleged that they did not receive VEMAT payments through other foster placements while they were removed from the Grochowski home between May 6, 2022 and July 6, 2022. Second, plaintiffs have not alleged that they remained eligible but were nevertheless deprived of VEMAT payments after Grochowski received provisional custody on July 6, 2022 and then full custody on January 4, 2023.

### 1) VEMAT Payments While in Other Foster Placements

Plaintiffs argue simultaneously that VEMAT payments belong to foster children, not foster parents, and that their receipt of VEMAT payments turned on their residing with Grochowski such that they lost their payments when they were removed from the Grochowski home. Plaintiffs cannot have it both ways. Because VEMAT payments are paid "based on the needs of the child," 22 Va. Admin. Code § 40-221-10, VEMAT payments follow the child between foster placements. The Virginia Child and Family Services Manual states:

> When a change in placement is made from one foster home to another regardless of whether or not the home is with the same agency, it is not necessary to complete a new VEMAT [evaluation] unless there has been a significant change in the child's behavior that would indicate a need to reassess for additional enhanced maintenance.

23

Title E: Foster Care, § 18.2.2.3 at 18. Because DSS presumes the original VEMAT calculation remains in place when the child moves between placements, the child's payment amount also stays the same, which indicates that the payments are not cut off because the child has moved to a new foster home. Indeed, the Virginia Child and Family Services Manual does not describe any automatic mechanism for terminating VEMAT payments due to a change in a child's placement or an investigation into or finding of neglect on the part of a foster parent.

Accordingly, plaintiffs' allegation that "their VEMAT support benefits" were "permanent[ly] los[t]" upon Brown's determination that Grochowski had committed physical neglect is not plausible. Compl., ECF No. 1, ¶¶ 61, 69. Plaintiffs' complaint does not support this conclusory statement with any factual allegations. Id. Plaintiffs have not alleged, for example, that some deviation in DSS's ordinary procedures for ensuring VEMAT payments reach foster children occurred. And because plaintiffs have not alleged anything about their foster placements subsequent to their "respite home" stay with Warren, id. ¶ 38, plaintiffs have not alleged what may have prevented hypothetical subsequent foster parents from receiving payments on plaintiffs' behalf. Even if plaintiffs had alleged a deviation from ordinary VEMAT procedures, it is unclear how such hypothetical wrongdoing would be traceable to Brown or Brake, rather than to some other DSS official.[10] In fact, Brown and Brake submit that it was their understanding that "[h]ad the M children remained foster children, with any foster parent in Virginia, the same payments would have continued for them, payable to the foster home to which they were assigned." Mem. Supp. Mot. Dismiss, ECF No. 8 at 9.

---

[10] In fact, because plaintiffs were placed by Henry-Martinsville DSS, not Roanoke County DSS, it is likely that Henry-Martinsville DSS remained responsible for managing their maintenance and VEMAT payments. Virginia Child and Family Services Manual, Title E: Foster Care, § 18.5 at 34.

Plaintiffs do plausibly allege that *Grochowski* stopped receiving VEMAT payments on plaintiffs' behalf once plaintiffs were removed from her care. Compl., ECF No. 1, ¶¶ 60-61, 69 (alleging that once Grochowski was determined to be guilty of "Founded-Physical Neglect," she would no longer be able to receive VEMAT benefits for plaintiffs). However, Grochowski is not a plaintiff, and even if she were, because VEMAT payments are for the benefit of the foster child, the foster parent has no property interest in them once the child moves to a different placement. See <u>Dupuy</u>, 397 F.3d at 515.

### 2) VEMAT Payments After Grochowski was Granted Custody

Plaintiffs allege that after the Henry County Juvenile and Domestic Relations court granted Grochowski provisional custody, the children were "returned to Mrs. Grochowski without their crucial, VEMAT support payments" because Roanoke County DSS "refused to take any action to revisit or amend the founded neglect complaint." Compl., ECF No. 1, ¶ 69. In the absence of any facts substantiating the contention that plaintiffs were still owed VEMAT payments at this time despite the change in their custodial status or indicating the mechanism by which the complaint against Grochowski affected plaintiffs' own entitlement to VEMAT payments, the causal link plaintiffs allege is implausible on its face. Because plaintiffs presumably were entitled to and, absent allegations to the contrary, continued to receive VEMAT payments while in other foster placements between May 6, 2022, and July 6, 2022, it was Grochowski's custody petition that caused the alleged deprivation.[11] Plaintiffs do

---

[11] Plaintiffs argue that although Grochowski's custody petition proximately caused plaintiffs to lose out on their VEMAT entitlement, Grochowski was motivated to petition for custody because of plaintiffs' removal, so that removal is also a proximate cause of plaintiffs' becoming ineligible for VEMAT payments. Resp., ECF No. 13 at 9-10. However, plaintiffs themselves allege that Grochowski had been pursuing adoption before the events of this case, Compl., ECF No. 1, ¶¶ 49, 78, and only an impoverished view of Grochowski's intentions would

not dispute that once Grochowski gained custody, plaintiffs were no longer foster children entitled to VEMAT payments.[12] Once plaintiffs became ineligible for VEMAT payments, they ceased to have a property interest in VEMAT payments, so no deprivation occurred.[13] Roth, 408 U.S. at 577 ("To have a property interest in a benefit, a person clearly must . . . have a legitimate claim of entitlement to it.").

Because plaintiffs have not plausibly alleged that they were deprived of their VEMAT payments while entitled to them, plaintiffs have not stated a Section 1983 claim based on an unconstitutional deprivation of property.

## C.  Qualified Immunity

Because plaintiffs have not established a constitutional violation, there is no need to consider whether defendants are entitled to qualified immunity. Nazario v. Gutierrez, 103 F.4th 213, 230 (4th Cir. 2024) (describing two-pronged test for qualified immunity which considers, first, whether a constitutional violation has occurred and, second, whether the right was clearly established at the time of the alleged violation).

---

suggest that she would have preferred for plaintiffs to remain foster children longer in order to continue receiving VEMAT payments rather than for plaintiffs to achieve stability in her custody.

[12] The complaint leaves ambiguous the precise legal status of the relationship between plaintiffs and Grochowski as of July 6, 2022 and as of January 4, 2023, although plaintiffs allege that Grochowski was "in the process of adopting [plaintiffs]" throughout the events alleged. Compl., ECF No. 1, ¶¶ 49, 78. Regardless, plaintiffs do not contest defendants' argument that plaintiffs were no longer foster children entitled to VEMAT payments after Grochowski became their custodial guardian, Mem. Supp. Mot. Dismiss, ECF No. 8 at 10; instead, plaintiffs' briefing relies on the contention that Grochowski's custody petition itself was caused by plaintiffs' being removed from her care, Resp., ECF No. 13 at 9-10.

[13] VEMAT payments are only available for foster children and for adoptive children under limited circumstances. See Virginia Child and Family Services Manual, Title E: Foster Care, § 18.2.1 at 11. New adoptive parents may negotiate an enhanced maintenance payment for their adoptive child where the child previously received VEMAT payments while in foster care, Virginia Child and Family Services Manual, Title F: Adoption, § 2.6.3.1 at 20, but plaintiffs here have not alleged that Grochowski successfully adopted plaintiffs or, if she did, whether such negotiations occurred or failed to occur—all of which is far removed from the alleged wrongdoing of Brown and Brake.

## IV. Conclusion

For the reasons stated above, the motion to dismiss for failure to state a claim is

**GRANTED**.

An appropriate order will be entered.

ENTERED: 11/05/2024

Mike Urbanski
Senior U.S. District Judge
2024.11.05 17:40:00
-05'00'

Michael F. Urbanski
Senior United States District Judge

27